The Georgia Railroad and Banking Company *vs.* Dabney.

---

THE GEORGIA RAILROAD AND BANKING COMPANY, plaintiff in error, *vs.* WILLIAM H. DABNEY, administrator, defendant in error.

1. The relation between a bank and its depositors, so far as it concerns the liability of the former to the latter for deposits made in November, 1861, and February, 1862, is controlled by the ordinance of 1865.

2. If the court distinctly so charges the jury. it is not a ground for a new trial, that the court further stated "that were it not for the ordinance, then the common law principles applicable to deposits would control, and the bank would have to pay the full amount deposited." For this addition to the charge, whether correct or not, could not, under the whole charge, have injured the defendant.

3. A notice given in 1862, by a bank to its depositors, to withdraw their deposits, though repeated in February, 1864, with the further notice, that on failing to withdraw, the deposits would be sealed up in pack-

ages and held at their risk, without proof of any further action on the part, either of the bank or its customers, in relation to such deposits, does not in law discharge the bank from all liability, under the ordinance of 1865, on account of the total failure of Confederate money. Such facts are proper for the consideration of the jury in adjusting the equities between the parties.

4. We cannot say that the refusal of the court to set aside the verdict was such an abuse of discretion as to call for interference by this court.

Banks. Deposits. Charge of Court. Scaling ordinance. Confederate money. New trial. Before Judge GIBSON. Richmond Superior Court. October Term, 1873.

Dabney, as administrator of Ammi Williams, brought assumpsit against the Georgia Railroad and Banking Company, on the following account:

" *The Georgia Railroad and Banking Company to Ammi Williams*, Dr.

November 19th, 1861—To money loaned, deposited and had and received to and for his use......................................$3,624 15

February 21st, 1862—To money loaned, deposited and had and received to and for his use......................................... 2,204 97

February 24th, 1862—To money loaned, deposited and had and received to and for his use........................................... 564 17

$6,393 29."

The defendant pleaded as follows:

1st. That the cause of action on which said suit was founded was certain deposits of Confederate treasury notes or checks, or drafts, representing and payable in such currency, and that it was understood by both parties at the time of making said deposits that the same were to be paid in like currency, and that defendant has always been ready to comply with such undertaking.

2d. That in the early part of the year 1864, the intestate of the plaintiff, then in life, was notified by defendant's agent to withdraw said deposits, and was informed that if not so done, the amount thereof in Confederate treasury notes would be set apart as a special deposit, and that said intestate did not, after receiving said notice, withdraw his deposits, and the

amount thereof, in such notes, was set apart as a special deposit for him, and so remains until this day, subject to the disposal of the plaintiff.

Upon the issue thus formed, substantially, the following evidence was introduced:

L. P. GRANT testified as follows: Said amount of $6,393 29 was deposited with the defendant at its agency in Atlanta at the times stated. The deposits were general. That of November 19th, 1861, consisted of one package of $1,000 00 of the bank notes of the defendant, two packages of $1,000 00 each, of notes of various banks, located mainly in Augusta and Savannah, five Confederate treasury notes of $100 00 each, and $124 15 in a check. The other two deposits were in checks of A. C. Wyly & Company. At the time of first deposit the currency was mainly bank notes; at time of second and third deposits, mainly Confederate treasury notes. At said three dates the defendant had suspended specie payment. Witness made said deposits at the request of plaintiff's intestate, and not as his agent. Does not know of a special notice to said intestate in reference to changing the form of these deposits; thinks there was a general notice to depositors to that effect; remembers such a publication in the Atlanta papers; date not recollected. Thinks the intestate saw it, as he read the papers regularly; demanded payment of the amount deposited from the cashier of defendant in Augusta on June 2d, 1868; made the demand as the agent for the plaintiff.

W. W. CLAYTON testified as follows: Was the manager or the defendant's bank, in Atlanta, from the year 1860 to 1863, and a part of 1864. The amounts deposited in the name of Williams are in the keeping of the bank, having never been checked out. The first deposit was either in paper currency or in checks payable in such currency; at the time the three deposits were made the currency in use in Atlanta was Confederate treasury notes, and not redeemable in specie, nor at par with it. Such currency was rapidly depreciating when the said deposits were made; there was no distinct and no general understanding at the time as to the currency in which the

The Georgia Railroad and Banking Company *vs.* Dabney.

deposits were to be paid; the deposits were payable on demand.   The general understanding between the bank and its depositors was that the depositors were to be paid in the currency circulating at the time the deposits were withdrawn. In 1862 or 1863, I notified Colonel Grant (who usually transacted Williams' business) to withdraw Williams' deposits; soon after the Confederate government passed an act taxing Confederate treasury notes, after a certain date, thirty-three and one-third per cent., and before said act went into operation, I notified all depositors, by hand-bills and publication in three daily (Atlanta,) papers to withdraw their deposits by April 1st, 1864, or about that time; the advertisements were first published about February 26th, 1864.   I have not the papers containing a copy of said advertisements, but their tenor was a notification to all the depositors to withdraw by April 1st, 1864, and that all who refused would have their deposits each placed in a separate envelope, with name written thereon, and deposited in the vaults of the bank, at their risk.   I have no doubt, from the circumstances and position of Colonel Grant and of Williams, that they were both acquainted with the advertisements. It was not the intention of the bank to reject the Confederate currency then used, but to avoid said tax.   It continued to receive and pay out said currency until the close of the war.

The bank book was placed in evidence, headed: "Debtor. Agency Georgia Railroad and Banking Company, in account with Ammi Williams, Creditor," and shows amounts and dates of deposits as testified to by L. P. Grant.

Isaiah Purse, the assistant of Clayton in the management of defendant's bank at Atlanta, testified substantially as did Clayton.   Plaintiff then closed.

### FOR THE DEFENDANT.

W. W. CLAYTON testified as follows: To the best of my recollection, said deposits were in Confederate treasury notes; none in specie, or bills of specie paying banks; said Confederate notes were then used as currency; don't recollect that any of said deposits were in checks on other banks; in May

The Georgia Railroad and Banking Company *vs.* Dabney.

or June, 1862, Williams' agent, L. P. Grant, who made all of said deposits as Williams' agent, was notified by me to permit his bank book to be balanced, and the balance brought down payable in Confederate treasury notes, thus: "Deposits payable in Confederate treasury notes." Said agent declined to do this, and I then notified him, in conformity with instructions received from the president of the bank, to withdraw said deposits, which he declined to do, without giving reasons; if Williams had consented to withdraw, I was prepared and willing to return deposits in current funds, such as were received and paid out by the bank for all debts in their business, and such as were recognized as currency by the business community generally; I was prepared and willing to return said deposits in such currency from date of deposit to the surrender; the reason of the general notice to the depositors to withdraw was on account of said tax; nineteen-twentieths of the depositors withdrew—one-twentieth didn't; but few declined; I never heard Williams authorize Grant to act as his agent, but he (Grant) made the deposits in Williams' name; when a deposit was made, the entry in the book was: "Deposited, $......" When said notice, in 1862, was given, there was not much difference between Confederate treasury notes and bank bills, as compared with gold; they had depreciated and were gradually depreciating; in August thereafter, they commenced depreciating rapidly; the reason for wishing the balance of the deposits entered payable in Confederate treasury notes, was because such notes had become the currency of the country, and it could not be told how long they would remain so; as the bank received them on deposit and in payment of all claims against customers, whether for contracts prior to or since the war, without a murmur, said bank thought it only fair, just and equitable, that it should be placed on the same footing, and so the order was made, and those who were unwilling to comply were requested and notified to withdraw their deposits; Grant, who had made all the deposits, and to whom notice was given, gave no reason for declining.

W. H. HULL testified, that Grant was Williams' son-in-

law, and that he was a high-toned gentleman; that so was Mr. Clayton.

Barber's tables, in 34 *Georgia*, 487, were considered in evidence.

The defendant closed.

The court then charged and refused to charge as set out in the motion for a new trial.

The jury returned a verdict for plaintiff for $5,016 30. The defendant moved for a new trial on the following grounds, to-wit:

1st and 2d. Because the verdict was strongly against the weight of the evidence, was inequitable and contrary to law.

3d. Because the verdict, even from the stand-point of the judge's charge, was unfair, unjust and grossly inequitable, for the charge placed the cause under the operation of the ordinance of 1865, and the evidence showed that the plaintiff, even under that ordinance, would be entitled to but a very small recovery, if anything.

4th. Because the court erred in charging the jury that the contract sued on was a Confederate contract, and therefore had to be determined by the ordinance of the state, passed in 1865, and that if it was not for that ordinance, then the common law rule and principle applicable to deposits of money would apply, and the defendant would have to pay the full amount deposited.

5th. Because the court erred in refusing to charge the following written requests:

1st. "That when a deposit is made with a bank in Confederate money, or in depreciated bank notes, the depositor, in the absence of any agreement to the contrary, can only demand payment in like currency."

2d. "That if, in such a case, the depositor fails to demand his deposits until Confederate money has become valueless, he has no right to recover anything."

3d. "That the bank had the right to notify the depositor to withdraw his deposit, and when it does so, and the depos-

itor refuses to withdraw it, and the currency in which it was payable becomes valueless, it is the loss of the depositor."

4th. "The common law rule applicable to the deposit of money, which makes the depositor the creditor and the bank the debtor, liable to pay on demand a sum identical in amount with the amount deposited, does not apply in cases where the deposit was made in Confederate notes, when it was understood and was the obvious intention of the contract that the payment back was to be in kind."

Said motion was overruled, and defendant excepted.

W. H. HULL; HOOK & WEBB, for plaintiff in error.

BARNES & CUMMING, for defendant.

TRIPPE, Judge.

1. The second section of the ordinance of November 8th, 1865, provides, "that all contracts made between the first of June, 1861, and the first of June, 1865, whether expressed in writing or implied, or existing in parol and not yet executed, shall receive an equitable construction, and either party in any suit for the enforcement of any such contract, may, upon the trial, give in evidence the consideration and the value thereof at any time, and the intention of the parties as to the particular currency in which payment was to be made, and the value of such currency at any time; and the verdict and judgment rendered shall be on principles of equity," etc. Here, there was certainly a contract between the bank and the depositor within the dates specified in the ordinance, and the defendant who excepts to the judgment cannot object that the case was held to be within that ordinance, when, under it, he was allowed a deduction of more than $1,300 00. We see no reason why the ordinance does not apply to the relation of a bank to its depositors, as well as to the case of any other creditor and debtor. . It applies to "all contracts" made between certain periods, and this is one of them : Morse on Banking, 26, 27, 43; Addison on Contracts, 546, 547, and

cases cited; 65 N. C. Rep., 13; 2 Wallace, 252. It is difficult to see how a contrary holding would be of any benefit to plaintiff in error—indeed, how it would not be the loser by it—unless it were also held that the principle of the ordinance would apply and govern the case, independent of the ordinance.

2. The court distinctly charged the jury that this case came within the ordinance; and it was not error, so as to be the ground for a new trial, that the court added, whether correctly or not, "that, were it not for the ordinance, then the common law principles applicable to depositors would control, and the bank would have to pay the full amount deposited." It is unnecessary to inquire whether the latter clause of the charge, under the facts of this case, was true or not. The charge was that such a principle did not control the case, but the ordinance did, and the jury acted in accordance with the charge. As to the point that the contract was illegal, etc., that is no longer a question in this state, since the decision in the *Georgia Railroad and Banking Company vs. Eddleman*, 38 *Georgia*, 465, rendered in 1868.

3. It was claimed that notice given by the bank to its depositors to withdraw their deposits, else they would be sealed up in packages and held at the risk of the depositors, discharged the bank, on account of the subsequent total failure of Confederate money. It was not in proof that there was such a sealing up, and a special appropriation of any specific bills for the depositors, under this notice; nor, indeed, that there was any action taken by the bank at all to make the notice effective, as they now claim it to have been. It was not a tender; or if it had been a tender, it was not proved that the action of the bank was such as to entitle it to demand of the depositor that he shall lose his whole claim simply because the bank had enough on hand, and finally lost enough, to pay its depositors. Besides, when the character of the deposits that were actually made by the plaintiff is looked to, it is by no means certain that the bank had an absolute right to demand of him that he should, at the pleasure of the

bank, receive Confederate money therefor, and that, too, at a time when that currency had imposed upon it, by the power that issued it, new and onerous conditions. This was the case as to the notice given in February, 1864, in connection with which was the further notice that the amounts due the several depositors who failed to withdraw would be sealed up, etc.

4. The jury gave a verdict for the value of Confederate money, rated at what it was worth about the time the deposits were made. They had the power to do this. No interest was allowed until some time in 1868, when the demand was made of the bank. Nor was the plaintiff entitled to any interest before that time. Although the verdict may be a liberal one for the plaintiff, yet when the judge who tried the case refuses to set it aside, and no rule of law has been violated, we will not interfere, unless there be a strong case of abuse of discretion.

Judgment affirmed.